SARAH E. ANDERSON, Respondent, v. CHARLES D. TYREE, Deputy Registrar in and for Second Precinct of Ogden City, Appellant.

1. Utah Enabling Act.—Construction.—State Constitution.—Elective Franchise.— Qualified Electors. — Women Not Entitled to Vote on the Adoption or Ratification of the Constitution, nor for State Officers.—Former Acts of Congress Not Repealed.—Act of Congress approved July 16, 1894, known as "The Utah Enabling Act," provides, section 2, "that all male citizens of the United States over the age of 21 years who have resided in said territory for one year next prior to such election, are hereby authorized to vote for and choose delegates to form a convention in said territory * * * persons possessing the qualifications entitling th: m to vote for delegates under this act shall be entitled to vote on the ratification or rejection of the constitution." Id. section 4, provides that the convention forming the constitution "shall provide by ordinance for submitting said constitution to the people of said state for its ratification or rejection at an election to be held * * * at which election, the qualified voters of said proposed state shall vote directly for or against the proposed constitution." Id. section 19 provides "that the election of officers for a full state government * * * at the time of the election for the ratification or rejection of the constitution, but the said state government shall remain in abeyance until the state shall be admitted into the Union." Article IV, section 1, of the constitution, provides "the rights of citizens of the state of Utah to vote and hold office shall not be denied or abridged on account of sex." Id. article XXIV (Schedule), section 11, provides "the election for the adoption or rejection of this constitution and for state officers herein provided for * * * shall be conducted according to the laws of the territory and the provisions of the enabling act * * * *Provided,* that all male citizens of the United States over the age of 21 years who have resided in the territory for one year prior to such

9

election, are hereby authorized to vote for or against the adoption of this constitution, and for the state officers herein provided for." Act of Congress which took effect March 3, 1887, known as "The Edmunds-Tucker Law," section 20, provides "that it shall not be lawful for any female to vote at any election hereafter held in the territory of Utah for any public purpose whatever." Id. section 24 provides "that every male person 21 years of age resident in the territory of Utah, shall  *  *  * take and subscribe an oath, or affirmation  *  *  * that he is over 21 years of age and has resided in the territory of Utah for six months  *  *  * and in the precinct for one month  *  *  * and that he is a native born or naturalized citizen of the United States." *Held; First,* that women are not entitled to vote on the ratification or rejection of the constitution. *Second,* that women are not entitled to vote for state officers at the election to take place on the same day as the constitutional election, since the constitution is not in force until after its adoption and the proclamation of the president of the United States has been issued in accordance with the terms of the enabling act. *Third,* that the enabling act does not repeal the prior act of Congress known as "The Edmunds-Tucker Law," prohibiting the exercise by women of the elective franchise and prescribing a registration oath requiring male citizenship as one of the qualifications of a person seeking to register or vote. (King, J., *dissenting.*)

2. ID.—ID.—ID.—ID.—STATE CONSTITUTION WHEN IN FORCE.—WHEN THE PEOPLE MAY EXERCISE SOVEREIGN POWERS.—CONGRESS THE SOURCE OF POLITICAL POWER OF THE PEOPLE UNDER TERRITORIAL CONDITIONS.—TERRITORIAL ELECTIONS AND ELECTORATE.—The enabling act, section 4, provides that the proposed state of Utah shall be deemed admitted by Congress into the Union upon the president issuing his proclamation. Id. section 5 provides that a representative to Congress, a governor, and other officers provided for in the proposed constitution, may be elected on the same day·the constitutional election is held. Id. section 19 provides that the state government provisionally formed shall remain in ab·yance until the admission into the Union of the state. Section 16 of the schedule of the constitution declares that the provisions of the constitution shall be in force from the day the president shall

issue his proclamation. *Held*, that the enabling act does not confer upon the people of the territory sovereign powers for any purpose until the constitution is adopted and proclaimed, nor powers to fix the qualifications of electors for state officers at the said election, nor did it confer upon the constitutional convention legislative authority to extend the privilege of the elective franchise to classes not previously enfranchised prior to the adoption of the constitution and the admission of the state of Utah into the Union, since by section 4, the state is not deemed admitted until the president's proclamation is issued, announcing the ratification of the constitution, and by section 5, the territorial officers are to continue to discharge the duties of their respective offices until the state officers are elected and qualified under the provisions of the constitution and the state is admitted into the Union, and while the territorial conditions continue, Congress is the source of political power of the people and that their elections, even on subjects relating to statehood, are territorial elections, and their voters are the electorate of the territory. (King, J., *dissenting.*)

3. ID.—ID.—THE ELECTIVE FRANCHISE A PRIVILEGE.—LEGISLATIVE ENACTMENT NECESSARY TO EXTEND TO CLASSES NOT PREVIOUSLY ENFRANCHISED. — MEANING OF PHRASE, " QUALIFIED VOTERS OF SAID PROPOSED STATE."—The elective franchise is permissive, and from its nature excludes all not within the classes pointed out, and it requires a legislative enactment to extend this privilege to classes not previously enfranchised. The phrase, " qualified voters of said proposed state," found in section 4, of the enabling act, means persons possessing the personal qualifications of age and male citizenship and residents of the geographical area included within the boundaries of the proposed state. Congress did not intend, by the language used in section 4, to confer by legislative enactment authority upon the constitutioual convention to extend the elective franchise to a class of persons not previously enfranchised while the territorial condition continued and prior to the adoption of the constitution and the admission of Utah into the Union. (King, J., *dissenting.*)

(No. 645. Decided Sept, 14, 1895. 42 P. R. 201.)

APPEAL from the District Court of the Fourth Judicial District. Hon. H. W. Smith, *Judge.*

*Mandamus* by Sarah E. Anderson to compel Charles D. Tyree, deputy registrar of voters, to register petitioner as a legal voter for the November, 1895, election, to be held for the ratification or rejection of a proposed constitution and for the election of officers for the proposed state of Utah. From a judgment for petitioner, defendant appeals. *Reversed.*

[The syllabus contains direct quotations from "The Edmunds-Tucker Act," the Enabling Act, and the Constitution not found in the body of the opinion, but as these statutes and the constitution are accessible to all, for the sake of brevity the portions quoted are not herein set out as an additional statement.—REP.]

*Mr. Robert Harkness, Mr. C. S. Varian, Mr. P. L. Williams, Mr. John M. Zane, Mr. Arthur Brown* and *Mr. A. T. Schroeder,* for appellant.

FROM THE ARGUMENT OF MR. HARKNESS:

*First*—The appellant claims that Congress, in the enabling act, has not extended or authorized the extension of the right of suffrage beyond the provisions of section 2, or, at most, beyond the provisions of that section and prior laws, and that no legislative power to enact laws for that purpose, or, in fact, for any purpose, was conferred on the constitutional convention. The clause quoted from section 4, standing alone, is clear in its interpretation and meaning, and in the natural order of the events directed by the act merely directs two things: To submit the proposed constitution to the people, and to direct that the vote on it should be taken directly and without any riders to aid in its adoption or rejection. This view is confirmed by

the provisions of sections 1, 3 and other provisions which show the meaning of the words "said proposed state" to be the area of the territory of Utah; also by section 2, which provides for the qualification of voters and only authorizes a change in the registration oath sufficient to test the facts that they are male citizens 21 years old and with a residence of one year. To hold that section 4 refers to the qualifications of voters, and impliedly enfranchises some undesignated class or classes, including women, would annul the acts of Congress providing and amending the registration oath and forbidding women suffrage in Utah, while there is no language in section 4, or in any part of the act, in conflict with those acts of Congress.

*Second*—As to the right of women to vote for state officers, the appellant claims there is no distinction in the law between that case and voting for or against the constitution. By authority of Congress, the whole scheme of state government is made part of the proposed constitution. That creates the offices, provides for officers, their qualifications, terms and duties, and fixes their compensation. The enabling act provides for a representative in Congress, fixes the day for the constitutional election, and, if the option to elect conditionally in 1895, is accepted, orders the election at the same time. There is to be but one election for all the purposes relating to the admission of the state and organizing the state government. This also appears from the omission to qualify or authorize the qualification of voters for more than one election, and Congress did not intend that for the November election there should be three registrations and three classes of voters—one for the territorial election, another class for the constitutional election, and a third for the state election—all on the same day. The first permission to elect

state officers is given in section 5, which in a general way
authorizes the election; again in section 19, the convention
is authorized to provide by ordinance for the election of
state officers, and in both sections the election is made
conditional upon the admission of the state by the suspen-
sion of their functions until that shall occur. The option
only authorizes the convention to choose whether the elec-
tion shall be in 1895, or await statehood. In this there is
only a discretionary power, administrative in its nature, and
such as executive and administrative in its nature, are
frequently authorized to make. Such powers, resting on
the authority of law for their exercise are very different
from the power to enact laws. The only scope of the
discretion granted, relates to the time of the election;
everything else is indicated by Congress, and to say there
is legislative power granted here to qualify voters, or that
the election is held by the authority of the convention, is
not justified by the language. Even if there is legislative
power granted to qualify an undesignated class of voters,
the conclusion that women can vote is erroneous, because
the power has not been exercised. On this branch of the
case, also, attention is directed to the fact that the permis-
sion given to hold the election in 1895, is not in conflict
with the acts of Congress respecting the registration oath
and prohibiting woman suffrage. The opinion of the dis-
trict court contains a series of statements deemed erron-
eous, to-wit: The statement that Congress acted merely
as the agent of the territory in passing the enabling act;
that legislative powers are granted to the constitutional
convention; that the election of state officers is by the
authority of the convention; that Congress cannot qualify
voters for the state election, and that Congress treated the
case, as to the state election, as if the people of the terri-
tory were vested with sovereignty.

The convention is not sovereign—it may not legislate. It *proposes,* but does not conclude. Jameson, § 315 *et. seq.,* § 318, last clause, § 352, pp. 343–4. Created by express law, it is restricted to the powers with which it has been invested. Jame. §§ 379, 409*e*, p. 413; Woods' Ap. 75 Pa. St. 59; *Wells* v. *Bain,* 75 Pa. St. 39, 56. Any other position of necessity involves the question of revolution, and, if true, would permit the overturning of all law and government. If the convention, holding its authority from the people, expressed by and through their electorate, may arbitrarily legislate a new body of electors into existence, who are to decide the questions proposed, the security of existing institutions is impaired. Jame. § 504, p. 517, § 507, p. 520, see § 509, p. 527. The statute must be construed in connection with the system of which it is a part, in the light of the common law and of prior statutes on the same subject. *Robinson's Case,* 131 Mars. 376; *Board* v. *Anderson,* 68 Fed. 343. By common political law, women, minors, idiots and lunatics are deemed excluded from the franchise without express prohibition, Cushing, P. Law, § 24. The policy of Congress was established by the Edmunds-Tucker law. In construing the enabling act, the maxim *expressio unius est exclusio alterius* applies. Congress was dealing specially with the qualification of the voter for a particular purpose. The enabling act is in recognition of existing law, since it removes disabilities and extends the franchise to a class prescribed by existing statutes. Suth. Stat. Con. § 325. "Specific provisions relating to a particular subject must govern in respect to that subject as against general provisions in other parts of the law which might otherwise be broad enough to include it." Suth. § 225. The very remarkable assertion in the opinion of the court below, that

Congress is the legislative agent of the people of Utah, is challenged absolutely. It indicates an utter misconception of the relations of a territory to the federal government. All the territories must necessarily be governed by Congress, and their relation to the general government as that which counties bear to the respective states; and Congress legislates for them, as a state does for its municipal organizations. *Nat. Bank* v. *Yankton,* 101 U. S. 133. The admission of new states depends absolutely upon the will of Congress, and the people of a territory may form a state government only in the manner allowed by enabling acts, and through the action of such persons as the *enabling acts shall clothe with the elective franchise to that end.* Cooley, Lim. 30.

### FROM THE BRIEF OF MR. ZANE:

It is apparent in the first place that suffrage is not a natural right. "Unless such a doctrine (that suffrage is a natural right) is susceptible of being given practical effect, it must be utterly without substance; and so the courts have pronounced it." So Judge Cooley affirms in Cooley, Prin. of Const. Law, 248. To the same effect is the decision of the Supreme Court of the United States in *Miner* v. *Happersett,* 21 Wall. 162. It is apparent that the specification of certain qualifications, as being a male, of twenty-one years of age, and of one year's residence, excludes all other qualifications. "*Expressio unius est exclusio alterius,* is an universal maxim in the construction of statutes," say the Supreme Court of the United States in *U. S.* v. *Arredondo,* 6 Pet. 691, at p. 725; *Page* v. *Allen,* 98 Am. Dec. 272. "Statutes should be so construed, if practicable, that one section will not defeat or destroy another, but explain and support it." *Bernier* v. *Bernier,* 147 U. S. 242. "It is a general rule, without exception,"

say the court, "in construing statutes, that effect must be given to all their provisions, if such a construction is consistent with the general purposes of the act and the provisions are not necessarily conflicting." "All the parts of the act must be harmonized and effect given to each part, if possible." *Washington Market Co.* v. *Hoffman,* 101 U. S. 112; *Platt* v. *P. R. R. Co.*, 99 U. S. 48. See, also, *Kohlsaat* v. *Murphy,* 96 U. S. 153; *Heydenfelt* v. *Mining Co.*, 93 U. S. 634. "Where the meaning of words in a statute are plain, there is no room for construction, but the statute must be enforced according to its terms." *Thornley* v. *U. S.*, 113 U. S. 310; *Poor* v. *Considine,* 6 Wall. 458. Applying these rules, we find the act says males can vote. This means that females cannot. It then uses in a later section the words "qualified voters of the proposed state." These words mean those who are declared qualified by this act; and the "proposed state" means the territory within the limits of the proposed state, and all the sections are given their plain meaning and do not destroy, but support each other.

Section 14 of article 24 of the constitution, since the section must conform to the enabling act, means by the words "qualified electors of the proposed state" those voters qualified to vote by the enabling act within the limits of the proposed state. Having repeated substantially the phrase of the enabling act, the convention must have used the words in the sense of the enabling act. *U. S.* v. *Mooney,* 116 U. S. 104. The same result follows, if we consider those two provisions as in *pari materia,* and to be taken together. *Reiche* v. *Smythe,* 13 Wall. 162. This view is rendered absolutely certain by section 11 of article 24 of the constitution, which in the proviso says: "Provided, that all male citizens or the United States over the age of twenty-one years, who have resided in the territory for one year prior to such election, are hereby authorized

to vote for or against the adoption of this constitution."
Recurring to the rule announced by Justice Baldwin for
the whole United States Supreme Court that "the mention
of one thing excludes all others not mentioned, is an uni-
versal maxim in the construction of statutes."    U. S. v.
Arredondo, 6 Pet. 691.    It follows that by express pro-
vision of the constitution only male citizens of a certain
age and residence can vote on the constitution.    This pro-
viso is an interpreting clause, and is to be considered not
a technical proviso, but a declaratory statement of law.
So, then, even if we concede that the qualifications of the
enabling act could have been extended by the constitution,
we find that the constitution itself does not extend them,
but absolutely prohibits females from voting on its adop-
tion, just as the enabling act does.    The other branch of
the question is whether a female citizen has the right to
vote for the state officers at the first election.    The only
provisions of the enabling act upon this point are:    Sec-
tion 5, which says that state officers may be elected on
the same day as the constitution is voted upon.    Obviously,
this has no bearing.    The next provision is: "Section 19.
That the constitutional convention may by ordinance pro-
vide for the election of officers for a full state government
*    *    *    at the time of the election for the ratification
or rejection of the constitution    *    *    *    and the state
government formed in pursuance of said constitution as
provided by the constitutional convention shall proceed to
exercise all the functions of state officers."    By this sec-
tion the whole subject of this election for state officers is
confided to the constitutional convention.

Turning then to the ordinance, which is article 24 of
the constitution, there are only the following provisions:
"Section 11. The election    *    *    *    for state officers
herein provided for shall be held on the Tuesday    *    *
*;    the votes cast at said election shall be canvassed    *

* * provided, that all male citizens of the United States, over the age of twenty-one years, who have resided in the territory for one year prior to such election, are hereby authorized to vote for or against the adoption of this constitution, *and for the state officers herein provided for.*" Here is a perfectly plain and unmistakable declaration that voters for state officers at that certain election shall be males. Certainly females are not males and do not fall within that description. A person who claims the right of suffrage must show some provision of law conferring the right. *Minor* v. *Happersett,* 21 Wall. 162. Here the provisions of law absolutely negative any such right. What basis is there for any claim that female citizens can vote for state officers we are not informed. But it certainly cannot be under section 14 of article 24, which uses the words "qualified electors of the proposed state," because that section is expressly confined to the vote upon the constitution and does not mention the voting for state officers. If reason for the claim be sought in the suffrage clause of the constitution, which is section 1 of article 4, a glance at it shows there is no basis in that clause. It is: "Section 1. The rights of citizens of the state of Utah to vote and hold office shall not be denied or abridged on account of sex. Both male and female citizens of this state shall enjoy equally all civil, political and religious rights and privileges." This manifestly applies to citizens of the state, not to citizens of the territory. There can be no state until the constitution is adopted and the state called into existence. By its very terms it is not applicable until the proposed state has become a state in actual fact. The schedule, as is required by section 19 of the enabling act, deals with the becoming a state, and that schedule confines the voting before the state comes into existence to male citizens of the United States resident in the ter-

ritory who have the necessary age and residence qualifications.

*Mr. Charles C. Dey, Mr. J. G. Sutherland, Mr. Ogden Hiles, Mr. S. R. Thurman, Mr. H. H. Henderson, Mr. F. S. Richards, Mr. H. P. Henderson,* and *Mr. J. W. Judd,* for respondent.

FROM THE BRIEF OF MESSRS. HENDERSON, RICHARDS AND DEY:

The record in this case presents two questions: *First*— Have women the right to vote upon the question of the adoption of the constitution? *Second*—Have they the right to vote on the election of state officers at the coming election? The two questions are wholly and absolutely distinct from each other and involve an application of different principles. If women have the right to vote upon the adoption of the constitution, that right must be found in some authority granted by Congress. As to their right to vote for state officers, that authority must and can only come from the constitution of the proposed state. The making of a new state which has before been a territory is an absolute change from one sovereignty to another. A territory is purely and wholly a creature of Congress. The sovereignty is in the United States, and all authority exercised in the territory is exercised by the United States government, acting through Congress, or by local officers acting by virtue of authority given by Congress. The supreme authority over the territory. is in the United States. 25 Am. & Eng. Enc. of Law, 953–4; *Benner* v. *Porter,* 9 How. 242; *Murphy* v. *Ramsey,* 114 U. S. 15–44. On the other hand, a state is the people comprising a particular territory having rights guaranteed to it by the constitution as an existing government and having supreme

authority, subject only to the powers of the general government under the constitution of the United States. To form a new state, there is but one regular course to pursue, and that is to obtain from the federal government authority in the form of an enabling act authorizing the people to propose a state government for acceptance by Congress, and when a constitution has been formed in pursuance of the enabling act to present it for ratification, and when it is ratified the new state government is brought into existence and the new constitution is in force. Under its terms the people proceed to elect officers as provided therein, and the state government is launched. To this regular mode of procedure in organizing the new state government, two modifications have come into existence by which this course of procedure has been somewhat changed, the object being to attain the same end. That is, to get the consent of the federal government to the organization of the state, the ratification of the constitution proposed, being followed by an election of officers as provided in the constitution.

The first modification arose in the case of Arkansas, where the people of the territory instead of getting from Congress an enabling act took steps within the territory itself looking to the formation of a state, and presented their petition to Congress in the shape of a constitution already formed. Congress, having the supreme authority to admit states, might exercise its authority and ratify the proposed constitution, and then the state would be thus formed, but if Congress should fail to do so, the proceedings of the people of the territory would amount to nothing whatever. Jameson, Const. Con. 201 (note); Opinions of Att'y Gen'l, vol. 2, p. 726. More recently, another modification of this practice has come into use, and that is, when an enabling act is procured from the general government, for the purpose of saving expense and to facilitate the intro-

duction of the state government the people of the territory have been authorized to anticipate the election which would naturally follow the admission of the new state under the constitution by holding it on the same day that they vote on the constitution, and if the constitution is ratified by the people and approved by Congress, then the state government as proposed by the constitution would be already equipped and prepared to proceed with the government of the new state; but this election, when so provided for, is an election under the constitution, and is the same election that would take place in the ordinary course of events after the constitution is adopted and after the state has been admitted.   It is only anticipating the first election by being permitted to hold it at the same time that the vote is taken upon the constitution.

*First—Have women the right to vote upon the question of the adoption of the constitution?*   To solve this problem then, we must look to the act of Congress and to nothing else.   The enabling act is the supreme authority upon this point.   There is nowhere in that act any authority delegated to the constitutional convention on the subject.   Congress itself settled that question.   Section 2 of the act provides: "That all male citizens of the United States over the age of 21 years, who have resided in said territory for one year next prior to such election, are hereby authorized to vote for and choose delegates to form a convention in said territory."   This plainly, explicitly and exclusively provides who may vote for members of the convention if there is no other provision of the act bearing upon the subject. The last clause of the same section provides as follows: "Persons possessing the qualifications entitling them to vote for delegates under this act shall be entitled to vote on the ratification or rejection of the constitution under such rules and regulations as said convention may prescribe not in conflict with this act."   Here is a provision that

all persons who are authorized to vote for members of the convention may vote upon the question of the adoption of the constitution. *But this is not exclusive.* There is a further provision in the same act upon this subject. In section 4, after providing the time when the election shall be held upon the question of the ratification of the constitution, it provides: "At which election the qualified voters of said proposed state shall vote directly for or against the proposed constitution, and for or against any question separately submitted." What did Congress mean by the phrase, "qualified voters of the proposed state?" It is equivalent to saying it shall be submitted to the voters as qualified by the proposed state. It is contended on behalf of the appellant that it means simply the territorial limits. This we insist would be absurd. Congress was dealing with a present territory and a future state. The territory then existed. The state at the time the election would be held would be merely a proposition. It would be a proposed state. The state as it will be organized is not the territorial jurisdiction of the government of the state, but it is the inhabitants themselves. We call attention to the language of the enabling act, section 1: "Be it enacted * * * that *the inhabitants* of all that part of the area of the United States now constituting the territory of Utah as at present described may become the state of Utah as hereinafter provided." We therefore contend that, the petitioner being a qualified voter under the constitution, she has the right to register and vote upon this proposition. We insist that it was the plain intention of Congress to provide absolutely, without qualification, that certain persons should vote upon this question, and in addition to them that it should be submitted to all those people upon whom, under the constitution as proposed, the responsibilities of government would rest. Any other construction would be against the

express letter of the act and would be absurd. Congress did not intend that the responsibilities of government should be thrown upon a people without their having a voice in saying whether those responsibilities should be accepted or not.

*Second—Have women the right to vote for state officers?* As to the second question, that of the right to vote for state officers, as before stated, it is an entirely different question and depends upon the constitution itself. The election is an anticipated one. It is just the same election that would, in the usual order of events, take place after the new constitution had gone into effect by the proclamation of the president. The constitution itself, for the purpose of that election, is conditionally in force. As to what officers are to be elected depends upon the constitution, and equally the question as to who shall vote for them depends upon the constitution. In voting for a governor and secretary of state, senators and the other officers provided for in the constitution, we only do so upon the theory that we are entering upon practical statehood. In providing for this first election, Congress is lending its aid to the institution of a new state. It has simply provided that when the new state government, as it is proposed, has perfected its organic law, the people may proceed, before the sovereignty of the general government has been withdrawn, to elect the officers provided for in the constitution in the manner prescribed by it, and Congress lends, for that purpose, the use of its machinery. Congress would have no power to do more than this. When the state is admitted it is entitled to all the rights of a state. Its rights are guaranteed by the constitution, and the general government, which is the supreme authority in the territory at the time this election is held, would have no right or power to officer the new state by officers of its choice by providing the qualifications of voters for

those officers. To admit the right of Congress to do this, and to force upon the new state such officers, would be at once a violation of the rights of the state. If this power and authority were once conceded to Congress, the administration that happened to be in power at the time the state was admitted might prescribe such qualifications of voters as would force upon the new state senators and representatives and state officers of its choice, thereby perpetuating its power. The senators that would be elected by the first legislature would hold their seats for years to come, and represent the state and not the territory.

Congress has fully recognized this want of power and has respected the rights of the new state very carefully in the enabling act. It has plainly stated its idea as to how the first state government shall be formed. In section 19, referring to this first election which is to be held at the same time the constitution is voted upon, it provides: "And the said government *formed in pursuance of said constitution,* as provided by the constitutional convention, shall proceed to exercise all the functions of state officers." The proviso to section 11 simply adds another class of voters to those already provided for (if it has any effect at all). There is no language in it indicating that it is exclusive of any other class. It simply provided that "all male citizens of the United States over the age of 21 years, who have resided in the territory for one year prior to such election, are hereby authorized to vote." The article on elections before quoted requires that they shall have been citizens for ninety days prior to the election, and shall have resided in the county four months and in the precinct sixty days next preceding any election, but this proviso provides that males shall not be subject to those restrictions and qualifications. It has no other or further meaning. It is contended by the respondent that the

10

schedule is as much a part of the constitution as any other part, and must be considered with it and in connection with all the other parts; and it is contended that this proviso is exclusive and rejects all voters not mentioned in it. The article on elections, as before stated, is broad and comprehensive and refers to all elections held under the constitution. It applies to the first as well as to any subsequent election. This would not be denied but for the proviso to section 11 of the schedule, yet there is no language in this proviso indicating that it is exclusive, but it goes to show that the body of the constitution related to all elections, including the first as well as all others.

MERRITT, C. J.:

By the judgment of the district court, the respondent was granted a writ of mandate, directing the appellant, as a registrar of voters, to register her as a legal voter for the November election, 1895, to be held for the ratification or rejection of the proposed constitution, and for the election of state officers for the proposed state. The appellant appealed to this court. As the case is intended to test the right of women to vote in November, 1895, it is a matter of considerable public interest, and the question has been earnestly argued. However desirable woman suffrage may be, it must first be authorized by law, and the women of the territory will not wish to commence the exercise of such a privilege by voting illegally. In the argument, the right to vote for or against the constitution, and the right to vote for state officers, have been discussed separately; and it will be convenient to follow that order, and first speak of the right to vote for or against the constitution.

It was conceded in the argument that the right of the

respondent to vote for or against the constitution rests on the enabling act of Congress. There are two prior acts of Congress to which reference must be made. One disapproves an act of the legislature of the territory allowing woman suffrage, and prohibits its exercise in Utah. The other, usually referred to as the "Edmunds-Tucker Law," provides for registering voters, prescribes a registration oath, and prohibits from voting any one who does not take the oath. Omitting special features of the oath, which require the voter to swear he is not a polygamist, etc., the principal personal qualifications are male citizenship, the age of 21 years and a residence in the territory of six months. The enabling act of Congress provides for the formation of a proposed constitution and state government, the ratification or rejection by the people, and, if so ratified, the result is to be certified to the president; and if he finds the constitution and state government are republican in form, and that the conditions of the enabling act have been complied with, he issues his proclamation announcing the result, and thereupon the state of Utah is deemed admitted. The enabling act is the legislation which settles the terms of admission, and the subject does not go back to Congress. The scrutiny of the work is made an executive act and duty. All the compact relations between the United States and the future state are fixed by this act, and the methods and order of procedure to attain statehood are carefully pointed out and authorized. Section 1 introduces the subject, and declares, in substance, that the inhabitants of Utah territory may become the state of Utah, on the conditions named in the act. Section 2 takes up the order of procedure, and as elections will be required, and voters are necessary to elections, it first provides that male citizens over 21 years of age, and who have resided in the territory for a year, may vote for and choose delegates to the constitutional convention, and

that the delegates shall possess the qualifications of elect-
ors.    After giving the number of the delegates, and dis-
tributing them to the various counties or precincts, it
provides that the governor shall call an election on a day
named in the section; that the Utah commission shall
cause a new registration of voters to be made under the
laws of the United States and said territory, except that
the oath required for registration under said laws shall be
so modified as to test the qualifications of the electors as
prescribed in the enabling act, and the registration is to
conform as nearly as may be with the provisions of such
laws.    After providing for the returns and canvass of the
votes, this section finally provides that persons possessing
the qualifications for electors of delegates shall be entitled
to vote for or against the constitution, under such rules or
regulations as the convention may prescribe, not in conflict
with the act.    Section 3 fixes a day and place for the
delegates to meet, and directs that, after they organize,
"they shall declare on behalf of the people of said pro-
posed state that they adopt the constitution of the United
States, whereupon the said convention shall be and is
hereby authorized to form a constitution and state govern-
ment for said proposed state."    This section also gives
mandatory conditions and limitations designed to preserve
federal relations.    Section 4 provides that, if a constitution
and state government shall be formed, the convention
forming the same "shall provide by ordinance for submit-
ting said constitution to the people of said state for its
ratification or rejection, at an election to be held on the
Tuesday next after the first Monday in November, 1895,
*at which election the qualified voters of said proposed state*
*shall vote directly for or against the proposed constitution,*
*and for or against    *    *    *.    any provisions separately*
*submitted."*    (This last clause is italicized for aid of refer-
ence; it is not italicized in the act.)    It should be noted

that the enabling act authorizes the submission of separate provisions, but none were submitted, and the proposed constitution provides for equal woman suffrage.

These recitals present the case so far as the right to vote for or against the constitution is concerned. The parties differ widely in their interpretation of the clause of section 4 put in italics. For the respondent it is contended that in the phrase "the qualified voters of said proposed state" there is a reference to all whom the constitution proposes to qualify, and who will be voters of the future state when it is admitted; that, when the constitution is formed, the class or classes referred to in section 4 are designed and authorized to vote for or against the constitution; and that, as the constitution, if adopted, will give equal woman suffrage, women are now entitled to vote for or against the constitution. In behalf of the appellant, it is contended that there is no legislation in this clause qualifying or authorizing the qualification or designation of any new class of voters, but only a direction of how voters otherwise qualified shall vote. This difference in view seems to arise out of the use of the words "of said proposed state"; for, if the words "qualified voters" stood alone, it could scarcely be said anything more was intended than that the voters should be qualified by some law in force at the time of the election.

The majority of the court cannot agree with the contention of the respondent. It is conceded that the grant of the elective franchise is permissive, and from its nature excludes all not within the classes pointed out, and that it requires a legislative enactment or authority to extend the privileges to classes not previously enfranchised. We are unable to find in the language italicized any legislative enactment or authority for extending the suffrage to whomsoever the convention may propose as voters for the future state, and this view is confirmed when the language

is construed in connection with the language of other parts of the act, and also taken in connection with the order of the various steps directed by Congress. If it was the intention of Congress that voters residing within the area called "said proposed state," and then qualified by existing laws, might vote at the November election, and should vote, if at all, directly for or against the constitution, and without coupling the question with any other subject which might aid in the ratification or rejection, the language is apt to the purpose, and it is wholly inapt to any other purpose. The voters were then to be qualified; that is, they were to be persons possessing the personal qualifications of age and male citizenship, and were also to be residents of the geographical area mentioned. To suggest the interpretation claimed by the respondent, the structure of the clause must be changed to read "the proposed qualified voters of said state." We cannot take such liberties with the language used, and especially when there is nothing in the act requiring it in order to carry out its intention, and when such a change would break the reference to the same words used before. It was conceded in the argument that when, in a law, an expression is found with a definite meaning, and afterwards occurs in the same act, it will be presumed to be used in the same sense. The first section, it will be seen, in pointing out what persons and what area may become a state, uses the words "inhabitants" for the persons, and the "territory of Utah" as descriptive of the area. In the third section the equivalent is "people of the proposed state," and the expression "said proposed state" occurs three times in the section, and in connections when it is impossible to refer it to any antecedent except the "territory of Utah" of the first and second sections. When we come to the language of section 4, the same expression is used, and with a reference back to some antecedent or

antecedents; and here, if the language "of said territory
of Utah" is substituted, it gives the meaning in which it
is used. From the time the words "said proposed state"
are adopted in the third section, they are used in the act
to describe area during the occurrence of events in the
transition period; and, when events are named to take
place after statehood, "state" is substituted for this ex-
pression. When the order of procedure directed by Con-
gress is considered, it is seen that the subjects are taken
up consecutively, and that each direction refers to a par-
ticular subject. Section 1 introduces the subject. Section
2 introduces the procedure by qualifying voters, and pro-
viding for the first election, and completes the subject of
qualifying voters by saying who may vote at the second
election, and this subject is not again mentioned. After
this they are assumed to be qualified voters. The consti-
tution and state government are formed under the third
section, and that part of the fourth section referred to
relates to what shall be done to adopt the instrument,
and how the vote shall be taken. The instrument must
be submitted to the people at an election to be held on a
certain day, and it may be observed that day is the one
on which the territorial election will be held, and for
which the rules and regulations are provided by law. If
this clause stopped here, the direction for submission would
be complete; but Congress had one more purpose, and
hence proceeded to provide that the voters must be per-
mitted to vote directly on the question; and, to enforce
this purpose, imperative language is used, which is never
used in an act qualifying voters. A consideration of other
laws of Congress, in connection with the enabling act,
would lead to the same conclusion, but that can be de-
ferred to the other branch of the case. It is sufficient on
this branch that there is not in the enabling act any

authority for the respondent to vote, or any power given to authorize her to vote in 1895.

The contention that the respondent is entitled to vote in 1895 for state officers is based on propositions which the majority of the court cannot accept. In addition to the claim that the italicized words of section 4 refer to the voters to be qualified in the proposed constitution, it is contended for the respondent that Congress has no power to fix the qualifications of voters for the proposed state officers; that, for the purpose of their election, the constitution is deemed as adopted and in force; that the people of the territory for this purpose are exercising, through their delegates, the sovereign powers of the people of a state, and have the right to fix the qualifications of the electors of state officers. It is, of course, conceded that the election and all the proceedings are conditional upon the attainment of statehood. This argument is based on a series of fictions for which we see no occasion or authority. The constitution is not adopted or in force, and the state is not admitted. The people of the territory are not exercising sovereign powers on any subject. The enabling act expressly states (section 4) that the state shall be deemed admitted when the president's proclamation shall be issued. Section 5 of the same act declares that the territorial officers shall remain until the admission of the state; and section 19 provides the state government, provisionally formed, shall remain in abeyance until the admission of the state. The constitutional convention declared, in section 16 of the schedule, that the provisions of the constitution shall be in force from the day the president shall issue his proclamation. Neither Congress nor the convention knew that by a fiction the constitution would be in force, or that the people would exercise sovereign powers for any purpose until the constitution should be adopted and proclaimed.

The contention that Congress cannot define the qualifications of voters for the first state officers, elected conditionally, while the territorial condition continues, because no such power exists as to the states, is clearly erroneous. It is too much like comparing the authority of a parent before and after the majority of his child. While the territorial condition continues, whatever political power its people exercise must be by authority of Congress. In all governmental affairs, whatever the people of a territory do must be authorized, and they must abstain from doing what is forbidden. Their elections, even on subjects relating to statehood, are territorial elections, and their voters are the electorate of the territory. In the compact for statehood, the people of the territory act for themselves and their successors, the people of the future state, and the latter are bound by the conditions accepted by the former; and it seems like stumbling on a small obstacle to say the people of the territory may bind the state forever to all the conditions and limitations to preserve the authority of the general government, and cannot, by the acceptance of a permission to elect the first state officers in advance of statehood, bind the state to this temporary and comparatively unimportant thing. If this cannot be done, the result is not that the people of the territory are sovereign as to this, but that the state will not be bound. The grant of this sovereignty, as to the election of state officers and the legislative power of the convention, must be shown by the respondent; and the claim seems to rest on inferences drawn from sections 5 and 19 of the enabling act. Section 5 provides for a representative in Congress, and that the representative, governor, and other officers provided for in the constitution may be elected on the same day the constitutional election is held. Section 19 provides that the convention may, by ordinance, provide for the election of officers for a full

state government, including members of the legislature and a representative in Congress, at the time for the election to ratify or reject the constitution. In these provisions are to be found, if at all, the grant of sovereignty to the people on this subject, and of legislative powers to the convention; and on these provisions rest the inference that as to this subject, the constitution is deemed in force, that it is a state election, and that Congress has no power to qualify the electorate. It will be seen the scope of the ordinance is very limited. By section 3, previously referred to, the convention is to form a constitution and state government as one instrument. In this the offices are created, and the terms, qualifications, and duties of the officers specified. Section 5 provides for a representative in Congress, and section 4 fixes the day of the election for which all the regulations are provided by law. There was but one thing left to the convention,—it could provide the state election should be in 1895, and, if it omitted to so provide, state officers would not be elected until after statehood should be attained. Everything else was provided. Whether deciding this was in the nature of a legislative provision is only a matter of words. It was a special power granted, and it could only be exercised under and according to the power, and from the minute it was exercised, the authorization of Congress is the sole authority for the election; and there is no ground for the inference that legislative powers to qualify voters were given, or for the fictions that the constitution was in force, and the people sovereign as to this election, or for the further structural conclusion that Congress, by granting this limited power, abdicated for any purpose its authority in the government of the territory, and could not qualify the electorate for a territorial election. If the legislative power to qualify voters for the state election had been granted to the convention, it failed to exercise it, and even did

not know it, for it refused by a strong majority vote to attempt to enfranchise women for the election of 1895; and sections 11 and 14 of the schedule only repeat the qualifications named in section 2 of the enabling act, and refer to qualified voters in the words of section 4, and, except in the proposed constitution, which we cannot consider in force, no other qualifications are mentioned.

In passing the first branch of the case, a more extended reference to prior laws of Congress was deferred, because those laws, if applicable at all, are applicable to the whole case. The law forbidding woman suffrage is not repealed by anything in the enabling act, and is not in conflict with that act. It is contended for the respondent that it does not apply to elections held in the proceedings to obtain statehood. It is true this is a new subject; but the elections are territorial elections, held by the people of the territory, and decided by their votes. The effect of these elections, from the nature of the case, reaches to and binds the people of the future state, either as successors or as the same people. Congress knew of this law, and, by limiting the electorate to male citizens, evinced an intention to maintain its provisions; and, in section 2, Congress directs the registration shall be made under the laws of the United States and the territory, except as to the change in the oath. There is no escape from this inference. It is a delicate thing for a court to set aside a positive act of Congress on some remote and speculative fiction, contrary to the plain facts; and, if the respondent's case depended on this point only, we do not see how she could maintain it.

The registration oath prescribed in the Edmunds-Tucker law of Congress is in force as to general elections. By section 2, and as to elections relating to statehood, Congress authorized a modification; and the provision is equivalent to a re-enactment in the modified form, for the pur-

pose of these elections. There is nothing in the enabling act repealing or in conflict with this provision. There is here no room for an argument that Congress did not intend this to apply to the new subject, and there is room for an argument, derived from this, that Congress was not forgetful of its prior enactments, and intended them to remain in force unless repealed or modified. The respondent is not a male citizen, and cannot register or vote under the provisions of this law.

Thus, there are several decisive objections to the right of the respondent to vote before the state shall be admitted. The oath of the Edmunds-Tucker law, either in its original form, or as authorized to be modified by the enabling act, applies to all territorial elections, and forbids her to register. The act prohibiting woman suffrage is applicable to all territorial elections, and forbids her to vote. There is nothing in the enabling act which, directly or indirectly, extends to her the privilege of suffrage, or repeals these laws. The constitutional convention was not vested with the power to enfranchise her, and did not attempt to do it, but repeatedly refused to attempt it. Against the plain provisions of the statute law, she presents only the erroneous interpretation that section 4 of the enabling act enfranchises the proposed voters of the future state, prior to the adoption of the constitution; the assumption of the fiction that, as to the election of state officers, the people are exercising state sovereignty, and that the constitution is deemed in force; a denial of the power of Congress to qualify the electorate for the election; and that the convention, as to this, was the representative of a sovereign people. The earnestness with which the respondent's case has been argued, and the degree of public attention and interest the case attracted, are the only excuse for following the case into so many details. The judgment in this court will be for a reversal

of the case, with costs, and remitting it to the district court, with directions to dismiss it.

BARTCH, J., concurs.

KING, J., dissents and will file a dissenting opinion hereafter.